Sale and wife vs. McLean et al.

---

SALE and wife vs. McLEAN et al.

1. CHANCERY JURISDICTION: *To remove cloud upon title, etc.*
   The rule heretofore adopted by this court that a bill in chancery to remove a cloud upon the title cannot be entertained where the plaintiff is out of possession, approved ; but if the case presents other grounds of equitable jurisdiction, or the remedy at law is inadequate, the court will take jurisdiction, notwithstanding the defendant is in possession.

2. — *Where the grounds of jurisdiction appear in a cross-bill.*
   If there should be a defect of jurisdiction under the original bill in a chancery proceeding, and the defendant files a cross-bill founded upon matters of equitable cognizance, it will cure the defect.

3. FRAUDULENT CONVEYANCE: *Proceedings to set aside.*
   Where a judgment creditor seeks to subject land which the debtor has conveyed fraudulently, the proper practice is to exhaust the process of the court, and apply to a court of equity for aid before a sale. And if he should levy on and purchase the land at execution sale before seeking the aid of the court, he might well be denied relief, unless the proceedings were in all respects fair and regular.

4. EVIDENCE: *To establish a trust in favor of the wife.*
   Where a wife sets up in a cross-bill, in opposition to the creditors of her husband, a trust in land alleged to have been purchased by him with her means, she will be required to make clear and satisfactory proof of the facts upon which the alleged trust is founded.

5. RESULTING TRUST: *By the payment of purchase money.*
   In order to create a trust in favor of one who pays the purchase money for land conveyed to another, the payment must be made at the time of the purchase, so as to make it one transaction. And if a husband, after the purchase of land in his own name, applies his wife's money to the payment of advances of purchase money made by others, it creates no trust or equity in her favor.

APPEAL from *Phillips* Circuit Court in Chancery.

*Hanley,* for appellants.

*Garland, contra.*

WALKER, J.   The appellees, William McLean, Benjamin May, Charles L. Moore, Robert C. Moore, and John J. Horner, filed their bill of complaint in the Phillips circuit court, against the appellants, in which they alleged that complainant, William J. McLean, on the 22d June, 1866, recovered judgment in the Phillips circuit court against the appellant, William F. Sale, for $2,000 debt, and $724.35 damages, with 8 per cent. interest thereon, and that complainant, May, for the use of the Bank of West Tennessee, on the 8th of January, 1867, recovered judgment in said circuit court against said William F. Sale, for the sum of $13,822.58 debt, and $982.40 damages, with interest at the rate of 6 per cent. That upon their judgments, executions were issued and levied by the sheriff upon the lands in controversy, as the property of the defendant in the execution, William F. Sale; that the lands were regularly sold by the sheriff to the defendant Horner, as agent for his co-complainants, to whom upon the payment of the sum bid, deeds were duly executed.

It is further alleged that before the rendition of the judgments under which they purchased, the defendant, Ann E. Sale, wife of William F. Sale, by her next friend, on the 8th day of February, 1866, filed her bill in chancery in said court

against her husband, William F. Sale, in which she alleged that in 1857, she married the defendant in the state of Alabama. That at the time of her marriage, she was possessed of a tract of land, situate in said state, of 1,140 acres, about 20 negroes, and other personal property. That about the 1st of October, 1857, her husband sold the land to Tweedy for $15 per acre, and that complainant ratified said sale, upon the express assurance of her husband that the amount received from the sale of the land should be invested by him in other land in the state of Mississippi or Arkansas. That she and her husband moved to Arkansas in January, 1857, where they have all the while since resided. That soon after their removal, her husband purchased from one Cooper & Pettis, the land in controversy, for which he paid $17,600. That the money so paid by her husband was the money received for the lands sold by him in Alabama, and other property owned by her in her own right. That the title to the lands bought in Phillips county, Arkansas, was taken in the name of her husband, with a prayer for a decree that the title to the land be vested in complainant, the wife. That process was served upon William F. Sale, the husband, but that he failed to answer or make defense, and on the 26th of June, 1866, a final decree was rendered in favor of complainant, vesting the title to the lands in her, to be held by the defendant for her sole use and benefit.

Complainants charge that before, and at the time this suit by the wife against her husband was brought, and when the decree was rendered, the husband was greatly involved in debt beyond his ability to pay. That this fact was known both to the husand and wife. That the creditors were not made parties; that the suit was brought by the parties, husband and wife, to defraud the creditors, and prevent the lands from being sold to pay the debts. That William F. Sale well

knew that the statements in the bill of his wife against him were not true, but made no defense, and permitted a decree to go against him for the express purpose of defrauding his creditors. They charge that it is not true that $17,600 was the price to be given for the lands; that they were purchased of Pettis alone, and for the sum of $18,380. That the land so purchased was not paid for with money, the proceeds of the sale of the wife's lands in Alabama; that only the sum of $4,600 was paid in cash, as appears from the deed, and that the balance was secured to be paid on time by notes thereafter to become due. That S. O. Nelson & Co., of New Orleans, were commission merchants and cotton factors, and, at different times, advanced to William F. Sale large amounts of money, and paid for him the notes given by him to Pettis for the lands, out of their own money, and charged the same with other moneys and advancements due, and that the notes given by Sale for the balance due are the notes sued upon, and upon which judgments were rendered in favor of William J. McLean and Benjamin May, complainants herein, and were given in consideration of such payment. That William F. Sale shipped his cotton from said plantation in his own name, and that the payment of the notes executed by Sale to Pettis, as well as other advancements of money and supplies made to Sale by S. O. Nelson & Co., were made upon the faith and credit given to Sale as the owner of the lands in controversy.

That the decree rendered in favor of Ann E. Sale is fraudulent and void, but is a cloud upon complainants' title, which prevents them from selling the same at a fair price.

The prayer of complainants is that decree under which Ann E. Sale claims may be declared void and set aside, as being a cloud upon their title, and that they be put into possession.

The defendant, William F. Sale, failed to answer, and as to him, the allegations in the bill are to be taken as true.

The defendant, Ann E. Sale, files her answer in which she denies all fraudulent combination with her co-defendant, and sets up in her answer by way of cross-bill, that she was the owner of lands in Alabama, and consented to the sale of them with an understanding that the money arising from the lands sold should be applied to the purchase of other lands in Mississippi or Arkansas.    That her husband bought the lands in controversy with her money, but that her husband took the title to the lands in his own name, not to defraud her, but to give himself credit, and prayed that the title to the lands be decreed to her, or she be decreed a lien on the lands for the money found to have been paid.    She also claimed that her husband and herself resided on the land, that he was the head of the family, etc. ; and 160 acres of the land was their homestead, and not subject to execution sale, with a prayer that her right of homestead be declared by the court and set apart to her.

A demurrer was filed to the original bill of complainants upon the ground that the state of case as presented by the bill was such as a court of equity could take no jurisdiction of.

The demurrer was overruled and the cause submitted to the court upon the state of case made by the pleadings and evidence.    Upon consideration of which, a decree was rendered in favor of the complainants, setting aside the decree rendered in favor of defendant, Ann E. Sale, in her suit against her husband, and affirming the title of complainants in all of the land in controversy, except 160 acres, which was decreed to the defendant, Ann E. Sale, as being exempt from sale under the homestead act.

From this decree the defendants, Sale and wife, appealed.

The first question to be considered is, Has a court of chancery jurisdiction of the case?

Chancery courts, as well as courts of common law, have well

defined subjects over which they exercise jurisdiction, and which are to be no more disregarded in the one court than in the other, and yet the pleader has a wider range in combining and presenting the facts which may entitle him to equitable relief than the common law courts have, and the facts are so complicated that each case must, to some extent, be determined upon its own merits, and yet all of them must be engrafted upon some one of the distinct subjects of the jurisdiction of the court.

Story says: "There are certain fixed principles on which courts of equity act, which are well settled. Courts of equity exercise no more discretionary power than courts of law. They may decide upon cases as they arise by the principles on which former cases have been decided, and may thus illustrate or enlarge the operation of the principles. But the principles are as fixed and certain as the principles on which the courts of the common law proceed." 1 Story's Eq., 22. In *Dugan v. Cureton*, 1 Ark., 31, it was held that the primary and original object of the suit must be one clearly within the jurisdiction of the court ; and in *Keatts v. Rector*, id., 410, Lacy, Judge, said : "The rules in chancery are doubtless far more liberal and comprehensive in their character, and in many respects infinitely more just and equitable, but they are not on that account less obligatory upon the parties or the court."

Under the guidance of these rules, when applied to the case under consideration, the facts presented show that it was evidently the intention of the pleader in this case to base his right to the equitable interposition of the court upon the grounds of fraud, a subject of the concurrent jurisdiction of courts of both law and equity ; and as a reason why the complainants do not resort to a court of law for redress, that they have the junior legal title, with such superior equities as

entitle them to be heard in a court of equity. In this case, the complainants say that one of the defendants owed them debts. That he owned a tract of land at the time their debts were contracted; that the debts were contracted upon the faith that he was the owner of the lands.      That, in fact, the debts were for money paid for him to Pettis in payment of the purchase money for these lands.      That the defendant not only purchased the lands, but took a deed for them in his own name. That he cultivated them and shipped the products of the plantation to S. O. Nelson & Co., in his own name; that the wife, the other defendant, never set up or asserted any claim to the lands, but that all the while from 1857 to 1866, they were held and claimed by the husband to be his individual property; that before and at the last date, he was largely in debt, was insolvent, and unable to pay his debts, and that for the purpose of defrauding complainants and hindering and preventing them from having satisfaction of their debts, the defendant, William F. Sale, combined and coöperated with Ann E. Sale, his wife, and upon the false and fraudulent pretense that the lands had been bought by the husband with the money of the wife, procured a decree to be rendered in favor of the wife for the property, which decree was fraudulent and void as against the creditors of the husband.      That they obtained judgments for their debts, upon which executions were issued, the land levied upon and sold, and that they by their agent, became the purchasers.

That the lands are in the possession of defendants, and that the fraudulent decree is a cloud upon their title.

. These are the grounds of equity set up in the bill, and which defendants contend do not present a case for jurisdiction.

The objection is not that this court has not jurisdiction of a question of fraud, and to remove a cloud upon the title of

complainants, but that being out of possession and the defendants in possession, the complainants have a clear remedy at law, in which the question of fraud may be inquired into, and complete redress afforded them, and, in support of this position, we are referred to the case of *Miller v. Neiman and wife*, 27 Ark., 233, as well as to a carefully considered opinion of one of the judges of this court, in which, however, two of the judges presiding declined to render any opinion upon that particular question. *Apperson v. Ford and wife*, 23 Ark., 746.

The opinion delivered by Judge FAIRCHILD in that case, although not authoritative as the opinion of the court, seems to have been carefully considered with a reference to numerous authorities, which would seem to establish the position assumed by defendant's counsel, which is, that in order to maintain an action to remove a cloud upon the title of property, the party who brings his case into a court of chancery for that purpose should aver that at the time of bringing the suit, she was in possession of the land. But it will also be seen that all of these cases are decided upon the ground that if the defendant is out of possession he has a clear remedy in a court of law, by ejectment against the defendant, who is in possession, and in which the question of fraud can be inquired into, and full and complete justice done. But as the jurisdiction in cases of fraud is concurrent, where the rights of the party cannot be asserted at law, or in cases where it can, when the remedy is not complete at law, the party may sue in equity, where complete and ample justice may be done, because it is the peculiar province of a court of equity to aid in administering the law in cases in which, by the rules of the common law, complete justice cannot be done, but in no case to interfere with the jurisdiction of the courts of the common law in cases in which that court has power to afford adequate relief ; and it is for this reason that when a party out of possession has

a superior legal title, he shall be held to resort to his action of ejectment to get possession; and it would seem that he should do this even when there is a cloud upon his title which he seeks to remove, which seems to be so well settled by adjudicated cases as well as by our own previous decisions (*Miller v. Neiman and wife*, 27 Ark., 233), that under the state of case under which they were made, we must give them our approval.

But it is equally clear, that if for any other cause the court of law should be found incompetent to do full and complete justice, and particularly in case of concurrent jurisdiction, a court of equity may rightfully take jurisdiction, and render that full and complete justice which the courts of common law may, because of the more stringent rules which control its action, be found incompetent to do. Thus, in *Branch v. Mitchell*, it was held that although the complainant was not in possession, if no one else was in possession, there being no one in possession to sue in ejectment, the party seeking to get possession and to remove a cloud upon his title, might resort to a court of equity for redress; and it was also held in the same case, that as the complainants held the junior legal title with superior equities, he might for that reason also resort to equity for redress.

We may here remark that in the case under consideration, the title of the complainants is the junior title, but as they contend with superior equity to the title of the defendant, Ann E. Sale, which is the senior title. It may be a matter of doubt whether the complainants may raise the question of fraud in the court of common law, and if fraud be found to exist, set aside the fraudulent senior title and assert his as the superior and only valid title, and one which we will not undertake to settle in this case.

There is also another ground of objection taken to the juris-

diction of the court, upon the ground that the lands were sold without first having applied to a court of equity to set aside the title of Mrs. Sale as fraudulent. It has been settled upon authority by this court in *Meux v. Anthony,* 11 Ark., 411, that when a creditor comes into a court of equity to set aside a sale of property which has been conveyed in fraud of his rights as a creditor, he must show that he is in a position to receive the benefit of the auxillary aid of the court; that is, he must have obtained judgment, and by process have been unable to get satisfaction out of the unincumbered estate of the debtor.

We are satisfied that this is the proper practice, and if not pursued by the creditor, as in this case, and he should levy upon and sell the property without first having settled the question of title, and buys it in, and thereafter finds it necessary to ask the aid of a court of equity, unless the proceedings were fair and equitable in all respects, he might well be denied relief in equity. Without wishing to be understood as asserting that in no case and under no circumstances, a valid sale might be made without first settling the question in equity, we do not hesitate to declare that it is a practice which should be discouraged. But in this case, whether the complainants did or did not make a case in their bill in which the court of equity would take jurisdiction, there can be no doubt of such jurisdiction since the defendant, Ann E. Sale, filed her cross-bill, in which she sets up a distinct title to the property in controversy, upon the ground that although the legal title is *prima facie* in her husband, that in fact he bought the lands with money, the proceeds of the sale of a tract of land which belonged to her, was hers before her marriage, and to which she consented to make sale, with the understanding that her husband would buy other lands with the money arising from the sale of her lands; that he did make the purchase of the lands in controversy.

This is substantially the case made by her. The case is one of implied trust over which this court has undoubted jurisdiction. By her cross-bill she makes this the forum before which both parties present themselves. The complainant has no longer the right to dismiss her bill. *Allen v. Allen*, 14 Ark., 666; *Jacoway v. McGarrah*, 21 id., 347. Story, in his work on equity pleading, p. 452, says: " A cross-bill being generally considered as a defense to the original bill, or as a proceeding necessary to a complete determination of the matters already in litigation, the plaintiff is not, at least as against the defendant in the original bill, obliged to show any ground of equity to support the jurisdiction of the court."

In the case of *Cockrell v. Warner and wife*, 14 Ark., 346, this court held that when a defendant filed his cross-bill founded on a matter clearly cognizable in equity, the cross-bill supplies any defect in jurisdiction, if any existed, and placed the court in possession of the whole cause, and imposed the duty of granting relief to the party entitled to it; the original and cross-bill being but one cause.

We think these authorities conclusive of the question of jurisdiction.

The next question to be determined is, Was there in fact an implied trust in favor of the defendant Ann E. Sale, in the purchase of the lands by her husband of Pettis? And this question is really narrowed to the fact, as to whether the lands were or not purchased by the husband, with the money of the wife; for unless this fact is made to appear, there can be nothing in the transaction out of which a trust could arise.

Ann E. Sale, in her cross-bill, claims that she owned lands in Alabama, which were sold by her husband, and that it was the money, the proceeds of this sale, with which the land was bought. Turning to the cross-bill we find that she alleges, and in her answer admits, that the land in controversy

was purchased in the latter part of November or first part of December, 1856, but the deposition of her husband and the exhibit to Cooper's receipt, which she makes part of it, show that the purchase, made by William F. Sale of Pettis, of the lands in controversy, must have been as early as the first of November, 1856. The receipt of Cooper who seems to have acted as agent for Pettis, and which is made evidence on the part of Mrs. Sale, is as follows: " This is to show that the note of Wm. F. Sale, in the hands of Drusy May, Esq., payable to myself, is credited on the first of this month, December, 1856, of $43.33 1-3 cents. The note is for $50, due some 18 months past. This credit grows out of a transaction this day had between William F. Sale and 'myself, as of the first of this month, Wm. P. McMahon, Esq., being intervening party for Mr. Sale, this 6th December, 1856. WILLIAM COOPER, Courtland, Alabama.

" William F. Sale has this day paid through his friend, Wm. P. McMahon, the sum of $6,500 as advanced, which James T. Pettis holds on him as first installment on the purchase of land made by said Sale of James T. Pettis, of the Blackfoot or Pillow place near Helena, Arkansas. This money was not strictly due until first of January, but I have credited Mr. Sale on a fifty dollar note I have of his in the hands of Drusy May for the sum of $43.33 1-3, being one month's interest on the $6,500, to procure him to pay it now, as of the first of this month. Test my hand this 6th day of December, 1856. And I guaranty this payment to me to be all valid, and as good as if paid to James T. Pettit. The above means furnished on the means of John J. McMahon, and William P. McMahon acts as his agent in this matter. WM. COOPER."

We have deemed it best to give this receipt at length, as it furnishes evidence, not only of the time when the land was

purchased of Pettit, but also of the terms upon which the purchase was made.   Cooper agreed with Sale to credit a fifty dollar note which he held on Sale to the amount of the interest due on the note up to the 1st of December, 1856, which amounted to $43.33 1-3.   The interest, if calculated at 10 per cent., the highest interest permitted by statute, would make the date of purchase, supposing it to have been the time when the note was given, about the 1st of November, 1856.

. It may be remarked that there is no other evidence showing the time when Sale purchased the land of Pettit.   Sale, in his deposition, attempts to explain why it was the deed bears date May 29, 1857.   He says that his recollection is, that the execution of the deed was postponed because Mrs. Pettit was absent from the state at the time, and that the date of the deed was probably as of the time when she executed it; and as regards the discrepancy between the $6,500, taken in connection with the three other notes executed by Sale to Pettit, and the three notes given for the last payments, and the sum set forth in the deed as a cash payment.   Sale is not certain, he states, that at the time he bought the land, he also bought of Pettit hogs, cattle, and 1,000 bushels of corn, but does not remember whether he paid for them in cash or not.   It is not very important in this case to determine here how this matter was, but it is probable that in the $6,500 note for the first payment on the lands, was included also the amount to be paid for the hogs, cattle and corn.   The price agreed to be given for the land was $18,380.   The recitals in the deed in regard to the consideration are as follows :

"That the said Pettit has this day, for, and in consideration of, the sum of $18,380 principal, and interest being $780, $4,600 of this sum has been paid in cash.   For the balance, said Sale has executed his three notes ; one, and the first note, dated January 1, 1857, due one year after date, for $4,333.33.

The second note, bearing same date, due two years after date, for $4,333.33. The third and last note, bearing same date, due three years thereafter, for $5,113.33, all payable to James T. Pettit." And the lien clause of the deed is as follows:

"For the punctual payment of said notes the said Pettit retains a lien upon the lands herein described, and sold and conveyed to William F. Sale."

It will be seen that the three notes described in the deed bear date the first of January, 1857; but in view of the other testimony, this does not fix the time when the purchase of the land was in fact made, because we find a note for $6,500 in existence on the 6th day of December, with an accumulated interest of $43.33⅓, which was on that day taken up by McMahon and described as a note "which James T. Pettit holds on him as first installment on the purchase of land made by said Sale of James T. Pettit, of the Blackfoot or Pillow place, near Helena, Arkansas."

Whether the other three notes were dated as of the 1st of January, 1857, although made in November, or whether other notes were executed at the time the note for $6,500 was executed, and afterwards given up and the time of payment altered, is not important.

The real question being as to when the purchase was in fact made, and whether upon a money consideration paid, or upon a credit; and, upon a careful consideration of the evidence, we are satisfied that the purchase of the land was made in November, 1856, and most probably early in that month, and in fixing this as the date of the purchase, there is really no very material difference from the allegations in the cross-bill of Mrs. Sale. She says: "It was late in November or the first of December of that year." No reference whatever is made in the deed to Mrs. Sale, or of any interest she may have in it, none whatever with regard to the ownership of the means

out of which the purchase money is to be paid.   It was a pur-
chase by Sale on time, by different installments, the first of
which was to be paid on January 1, 1857; that $6,500 was
the first installment, and most likely there was included in it
the price to be paid for the hogs, cattle and corn, no money
whatever was paid.   It was a purchase by Sale in his own
name, upon his own credit, secured by a lien on the land.
The deed was made to him.   The cross-bill alleges that this
purchase was made with Mrs. Sale's money, the proceeds of
the sale of land which she held, and that the land was sold
with the understanding that the money arising from the sale
of the land should be invested in other lands, in Arkansas or
Mississippi.   This is an affirmative allegation, of which she is
required to make clear and satisfactory proof.

After a careful examination of all the evidence, we find no
direct or positive evidence as to the time when the wife's lands
were sold.   The husband testifies fully and at length upon
the sale of the Alabama lands.   It is proven that the lands
were sold to Tweedy for the price of $17,149.39, to be paid
by installments on time, one-third to be paid March 1, 1857,
the balance in one and two years after.   In the fall of 1856,
but what time in the fall is not given, Sale states that he then
went to Arkansas and bought the land in controversy.   But
there is evidence which tends to show that the sale of the
lands in Alabama was made after the purchase of the lands
in Arkansas.   We have seen that on the 6th of December,
1856, McMahon assumes the payment of $6,500, the first in-
stallment due on the purchase of the lands in Arkansas, and
on the 13th of December thereafter, Tweedy, who purchased
the lands in Alabama, gives his note to McMahon for the sum
of $5,716.44.   This note, it is to be inferred, was given at the
time Tweedy purchased the Alabama lands.   William F. Sale
says: "William M. Tweedy executed his note for the pur-

chase money for my wife's lands in Alabama; one, and the first, to J. J. McMahon for $5,716.44, due the 1st of March, 1857. This was to secure McMahon to the amount of the note for the sum of $6,500 advanced by him to me, and by me paid to William Cooper, agent for J. T. Pettit, as first installment on the land in controversy. Said payment was made in December, 1856. My recollection is that he gave the notes, the first payable as above stated to McMahon, the others to myself. One of which, the second installment, due March 1, 1858, was afterwards divided, one to J. B. Coons, the other to myself. My recollection is, this was done to raise money of Coons to meet a payment falling due on the land in controversy."

The note referred to by this witness as having been executed by Tweedy to McMahon, is made part of the evidence in the case, and is as follows:

"COURTLAND, Ala.

"On or before the 1st day of March next, we, or either of us, promise to pay to the order of John J. McMahon, the sum of five thousand seven hundred and sixteen and $\frac{44}{100}$ dollars, for value received.

"Witness our hands and seals this 13th day of December, 1856.	(Signed)

"J. M. TWEEDY,	(L. S.)
"THOMAS LIGHTFOOT, (L. S.)
"T. T. TWEEDY.	(L. S.)"

This note, it will be seen, bears date of the 13th of December 1856. William F. Sale says the sale of the land to Tweedy was on time, one-third to be paid on March 1, 1857, the balance in installments of one and two years. The first was given to McMahon, the other two to himself. We have seen that McMahon arranged the payment of Sale's note with Cooper, on the 6th of December, 1856; and, if Tweedy exe-

cuted the notes for the purchase money at the time of his purchase, then the purchase of the Alabama lands was made after the purchase of the lands in Arkansas. Without attempting to reconcile these apparent inconsistencies which, after all, do but leave the question of the time of the sale in doubt as conflicting with the statement of witness Sale, who says, "that after he sold the lands in Alabama, he came to Arkansas and made his purchase of Pettit," it still leaves the evidence clear and conclusive that the lands were bought by William F. Sale upon a credit. That the first note was taken up and paid by McMahon, and the other three notes were taken up and paid as they fell due by S. O. Nelson & Co.; and that they charged William F. Sale, in their general account with him, for the same. The accounts show credits by receipts of cotton and moneys received, and it is equally clear from the evidence that at the time these payments were made, Sale had no money in their hands, either his own or his wife's. The witness Thomas Nelson, one of the firm of S. O. Nelson & Co., states positively that the amount of shipments of crops by Wm. F. Sale did not pay his indebtedness as it accrued. That witness could not state definitely the indebtedness of Sale at any one time, but that at the end of any one season it was greater than the amount of the notes given to Pettit for the lands, and paid by the firm. That on settlement in 1865 or 1866, Sale was indebted to S. O. Nelson & Co. between fourteen and fifteen thousand dollars, besides notes to the amount of between five and ten thousand dollars. That a settlement was made, and notes given by Sale for between fourteen and fifteen thousand dollars. That the notes were transferred to Ben. May in 1866. That the inducement for making the advancements to Sale was the property which he owned, and particularly the lands in controversy.

The proof shows, that after the land had been purchased,

and after Sale had executed notes for the payment of the purchase money, on the 6th of December, 1856, he borrowed money from McMahon with which he paid the first install-ment note of $6,500 to Pettit, $4,600 of which sum was applied to the payment of the lands which he had bought, and most likely, the balance to pay for cattle, hogs and corn, purchased of Pettit at the same time that he bought the land. To secure McMahon for this borrowed money, after-wards, on the 13th of December, 1856, he caused Tweedy, who bought the land which belonged to his wife, to execute his note to McMahon for $5,716.44. This note was part of the proceeds of the sale of the land, and was to be paid March, 1857, and was, during that year, paid to McMahon to satisfy the debt which William F. Sale had contracted with him for borrowed money. It is also in proof, that a considerable sum of money was remitted by William F. Sale, either directly or indirectly, to S. O. Nelson & Co., and Sale him-self deposes, that it was a sum sufficient or nearly sufficient to pay the notes which Sale owed to Pettit, and which S. O. Nelson & Co. had taken up and paid. Witness says, that the money sent to S. O. Nelson & Co., was money received from the sale of his wife's land. Concede all this to be true, and yet the testimony shows with like certainty, that the notes were taken up and paid before these remittances were made, and had been charged in a general account against Sale. Sale gave no direction as to how these remittances should be placed to his credit. S. O. Nelson received and applied the money as a credit upon the general account of Sale, which, in the absence of special instructions, they had clearly a right to do. An outstanding balance is, upon settlement in 1865 or 1866, shown to have been nearly $14,000, for which Sale gave his note.

Such is substantially the evidence, and upon which we are

called to decide, whether the evidence is sufficient to raise an implied trust in favor of the wife, upon the ground that the land was purchased with her money.

The law is, " that if a purchase of property be made, and the deed is taken in the name of one party whilst the consideration is given or paid by another, a resulting trust immediately arises by virtue of the transaction, and the person named in the conveyance will be a trustee for the party from whom the consideration proceeds." Hill on Trusts, 91. And "this doctrine is strictly limited to cases where the purchase has been made in the name of one person, and the purchase money has been paid in another." 2 Story's Eq., 631. "And where the trust does not arise on the face of the deed itself, the parol evidence must prove the fact of the advancement of the purchase money very clearly." Leading Eq. Cas., 265.

The purchase money must be paid or secured by another at the same time or previously, and, as part of one transaction. *Buck v. Pike*, 11 Me., 9; *Boyd v. McLean*, 1 Johns. Ch., 582; Adam's Eq., 330 and 331.

It is evident from these authorities, that the trust must immediately arise by virtue of the purchase, and of the consideration paid, as said by Hill, above cited; and if it is to arise out of such payment, then, of course, the payment must be made at the time the purchase is made, as held in *Buck v. Pike*, and other authorities above cited. If no trust was created at the time of the purchase, none can arise afterwards, because the rights of the parties must, of necessity, become then fixed.

In the case under consideration, it has been argued, that if the money of the wife was, after the purchase made by the husband in his own name, and, upon his individual credit, paid to those who had advanced money with which the hus-

Sale and wife vs. McLean et al.

band had paid his notes given for the purchase of the land, such payment, though not directly, was indirectly, a payment of the purchase with the money of the wife.

It seems however to us, that in this case, it was but in fact an application of the money of the wife to satisfy debts which Sale had contracted, no doubt, to enable him to pay for the lands purchased. But be this as it may, this was most clearly no purchase of land with the money of the wife, for no money was at that time paid, certainly not of hers, for at that time she had received none from the sale of her lands. Such being the case, there was no implied trust raised in the wife's favor upon the lands.

This disposes fully of the case as made by her bill. It is the only ground set forth for equitable jurisdiction, and one she has failed to sustain in proof.

But as the prayer for relief is alternative, that is, that if she fails to establish a trust, she should be entitled to a decree for a lien upon the land to the extent of the money of hers which was applied to the purchase of the land, we will see upon what grounds her claim for relief rests.

We have already made sufficient reference as to how, and for what purpose, her money was in fact expended. But then if, as we hold, there is no trust created in her favor, upon what grounds of equity can she rest her case for the interposition of this court to enforce a lien? If the fact of this indirect payment entitles *her* to an equitable lien on the lands, we are at a loss to see why S. O. Nelson & Co. might not also have asserted their right to a lien upon the land, because their payment of the purchase money was made directly to Pettit, and out of their own money. We have looked carefully into the authorities to see whether, under the ancillary powers of the court, a decree might not be rendered in the wife's favor in consideration that the money (conceding such to have been

the case) was paid for the debts contracted for the purchase of the land, but have failed to find an authority, or an adjudicated case to sustain such a decree. Cases frequently occur in which from oversight, negligence or prodigality, or even when revolutions produce disaster and ruin, but the court, however conscious that such is the case, cannot depart from the well established principles upon which equity jurisdiction is founded to afford relief in exceptional cases of hardship.

The husband has failed to answer; the debts were his, founded upon a meritorious and valid consideration. Judgments have been rendered, the property levied upon and sold, and bought in by the creditors; there has been carried out of their purchase 160 acres as a homestead, embracing the buildings and, doubtless, the best improved and most valuable land. The right of homestead claimed in the amended cross-bill, in right of the husband and wife, who were actual residents upon the land with their family, seems to have been conceded by the parties in an agreed state of facts, signed by the counsel of both parties, and was decreed to them by the court, and in regard to which in any event we have nothing to do. The complainants have not appealed and have submitted to the whole decree. So far as regards the 160 acres decreed as a homestead, the decree will stand, and as regards the 80 acres sold by Sale and wife, the decree, under the agreement of the parties, in affirmance of such sale, was proper, and when we apply the law as we hold it to be, and as applicable to the equitable rights of the parties, the decree in affirmance of the title of complainants to the residue of the land in controversy was also correct.

Finding no error in the proceedings of the court below and in the decree rendered therein, the same is in all things affirmed.