GRAYSON v. BOWLIN.

Opinion delivered February 1, 1902.

1. RESULTING TRUST—WHEN CREATED.—Where a minor purchased and paid for land, and took deed in his father's name, the parties supposing the son incapable of taking title by reason of minority, a resulting trust arose in favor of the son and his grantee. (Page 148.)

2. SAME—STATUTE OF FRAUDS.—Where title to land purchased and paid for by a minor son was taken by his father on account of the son's supposed incapacity to take title, an express oral agreement of the father to hold as trustee for the son will not change the nature of the transaction from a resulting trust to an express trust, which would be within the statute of frauds. (Page 150.)

3. SAME—STALENESS.—A resulting trust cannot grow stale so long as the *cestui que trust* remains in possession and control of the property, with the trustee's consent. (Page 150.)

Appeal from Greene Chancery Court.

EDWARD D. ROBERTSON, Chancellor.

Affirmed.

*Appellants pro se.*

If any trust arose in favor of Melville Francis, it was an express trust, and was void under the statute of frauds. 50 Ark. 71; 45 Ark. 481; 45 Ark. 48. Before a resulting trust could have arisen, it was necessary for him to have paid, at or before the purchase, the purchase money. 6 S. E. 209; 20 Ark. 612; 30 Ark. 215; 17 Atl. 713; 25 N. E. 1095; 25 Atl. 481; 48 Ark. 169; 25 Pac.

143. The purchase was complete when the notes and title bond had passed from the vendor. 13 Ark. 533; 27 Ark. 61; 29 Ark. 357. The payment of the purchase money is necessary for resulting trust·to arise. 55 Ark. 109; 20 Ark. 374; 44 Ark. 365; 42 Ark. 300; 29 Atl. 769; 8 So. 369; 42 Pac. 152; 21 Ark. 379; 41 Ark. 301. The proof of a resulting trust must convince beyond a reasonable doubt. 21 Wall. 178; 46 Ark. 35, 36. Appellee's right is barred by laches. 14 Ark. 62; 47 Ark. 111; 9 S. E. 46. Proof of resulting trust must be strong, clear and convincing. 57 Ark. 632; 48 Ark. 20; 37 Ark. 146; 50 Ark. 71; 42 Pac. 152; 40 N. W. 717; 10 S. W. 26.

*B. H. Crowley* and *M. P. Huddleston,* for appellees.

An invalid agreement cannot destroy an otherwise good cause of action, and this is true of resulting trusts. 59 Miss. 148-151; 46 Md. 565. Title bond is not even color of title. 67 Ark. 187; Martin's Ch. Dec. 117. It is impossible to raise a resulting trust, so as to divest the legal estate of the grantee, by the subsequent  application of the funds by a third person to the satisfaction of the unpaid purchase money. 29 Ark. 612; 30 Ark. 230. The case must turn upon the intention of the person who paid the purchase money. Perry, Trusts, § 151. Resulting trusts need not be in writing. Rice, Ev. 284-290; Tied. Real Prop. 500; 6 Ballard, Real Prop. 939; 7 do. 840; 42 Ark. 505; Perry, Trusts, 145-147; 40 Ark. 67, 68. Whether a trust or advancement is a question of intention, and if there are any circumstances which show that a trust was intended, the presumption of advancement will be rebutted. 54 Ark. 596; 6 Ballard, Real Prop., 811; 5 do. 775; 9 Ark. 518; 68 Ark. 89; 64 Ark. 155. There is no bar by laches. Perry, Trusts, § 141; 12 Am. & Eng. Enc. Law, 533; 28 Ohio St. 568, 580; 37 N. J. Eq. 130; 12 Am. & Eng. Enc. Law, 544, 599, 569. The appellant is barred by laches. 64 Ark. 345. To establish a resulting trust proof need not be distinct or preponderating unless there be a presumption of an advancement to overcome. 7 S. W. Rep. 497.

*W. W. Bandy,* for appellants in reply.

Possession of one tenant in common is possession of all. 42 Ark. 289. Appellant is not barred by laches. 61 Ark. 527.

BATTLE, J. M. L. Grayson and her husband, A. D. Grayson, instituted an action in the Greene circuit court against W. P. Bow-

lin to recover one undivided sixth interest in certain lands described
in their complaint. At the same time, and in the same court, T.
D. Henderson, Jr., by his next friend, brought an action against the
same defendant to recover an undivided one-twelfth interest in the
same land. These two actions were afterwards, by a consent order
of the court, consolidated, and William T. Francis and Melville
Francis were, on their motion, made defendants.

Plaintiffs, respectively, alleged in their complaints that John
Francis departed this life, intestate, seized and possessed of the
lands described in their complaints, and left Elizabeth Francis,
his widow, and William T. Francis, Melville Francis, and W. M.
Henderson, C. E. Henderson, T. D. Henderson, and M. L. Grayson,
in right of their mother, Elizabeth Henderson (born Francis),
his only heirs, him surviving; that T. D. Henderson died, leaving
T. D. Henderson, Jr., his only heir; that W. M. Henderson con-
veyed his interest in said lands to M. L. Grayson, and that the de-
fendant, Bowlin, was in unlawful possession of the lands.

The defendants answered, and denied that John Francis died
seized and possessed of said land, but alleged that the defendants,
William T. and Melville Francis, purchased and paid for the same,
and their vendors conveyed it to William T. and John Francis,
and that John Francis held one undivided half of it in trust for
Melville; and the defendant asked that the court so declare, and
that all the right, title and interests "which the plaintiffs, or either
of them, may have or claim in or to said lands be divested out of
them, and vested in the said Melville Francis," and for other relief.

The plaintiffs replied, and denied the foregoing allegations of
the defendants, and alleged that, if any trust in Melville's favor
ever existed, it was an express trust, and is void because it was not
in writing, and is stale.

The court, on motion of the defendants, transferred the cause
to its equity docket; and, after hearing the evidence, found in favor
of the defendants, dismissed the complaints of the plaintiffs, and
decreed that the title to the lands vest in the defendant Bowlin;
and the plaintiffs appealed.

The facts, as we find them, according to the preponderance of
the evidence adduced at the hearing, were substantially as follows:
William T. and Melville Francis were the sons of John Francis.
Melville being a minor, his father emancipated him at the age of
17 years, and allowed him after that to receive and use the

wages and products of his labor as his own property. After this, in the month of December, 1867, William T., for himself and Melville, during the minority of his brother, purchased an undivided three-sixths interest in the lands in controversy, on a credit of one and two years. John Francis, the father, wrote the notes for the purchase money and the bond of the vendors for title. Believing that Melville was incapable, on account of his minority, of making a valid contract and acquiring real estate, he signed the notes with his own name for Melville, and William T. signed for himself. The bond, as written, obligated the vendors to convey the three-sixths interest to John and William T. Francis when the purchase money was fully paid. William T. and Melville afterwards paid the purchase money. Their father paid no part of it. Thereafter, on the 24th of February, 1870, Melville still being a minor, the vendors conveyed the lands to John and William T. Francis for the same reason the bond for title was executed to them. In the month of November, 1869, William T. purchased, for himself and his brother, another sixth interest in the same land on a credit of two and three years. John and William T. Francis executed their promissory notes for the purchase money, and the vendor executed his bond for title to them, for the same reason the other notes and bond were executed. At the maturity of the last notes William T. and Melville paid them, each paying one-half. On the 25th day of May, 1872, Melville being a minor, the vendor conveyed the one-sixth interest to John and William T. Francis. After this Melville, being 21 years old, purchased the remaining two-sixths interest in the land for himself and William T., and took a deed for the same to himself and brother. After each purchase William T. and Melville took possession of the interests thereby acquired, and controlled and managed the same as their own property. The father admitted that he held one-half in . trust for Melville, and, so far as the evidence discloses, never denied that he so held. The brothers held and controlled the land as their own until sometime in September, 1891, when Melville, having acquired the interest of his brother, sold and conveyed the land to the defendant, W. P. Bowlin, who took possession and placed valuable improvements on the same. The actions brought against him to recover the land were commenced on the 18th of August, 1897.

"That the father," said Chief Justice English in *Fairhurst* v.

*Lewis,* 23 Ark. 438, "had the right to permit his son, during his minority, to labor for himself, and appropriate his wages according to his own inclinations, is well settled." In the case at bar the father permitted his son, Melville, to labor for himself, and to enjoy and appropriate the product of the same to the purchase of one undivided half of the land in controversy. Believing that Melville was incapable of acquiring real estate during his minority, four-sixths of the land in controversy were conveyed to the father and his brother, William, notwithstanding it had been purchased by him and his brother, and one-half of the purchase money had been paid by him according to the agreement and understanding entered into at the time of the purchase. Did John Francis hold one-half of the land in trust for Melville?

In *Milner* v. *Freeman,* 40 Ark. 62, 68, Justice Smith, delivering the opinion of the court, said: "A further objection was that the plaintiff did not pay the purchase money at the time of the purchase. The evidence conduced to show that he bargained for the lots before he paid for them; the payments not being completed until the deeds were made. This court in *Sale* v. *McLean,* 29 Ark. 612, and in *Duval* v. *Marshall,* 30 *id.* 230, said in effect that, in order to create a trust of this nature (resulting trust), payment of the purchase money must be made at the time of the purchase. By this it was meant that the trust must arise, if at all, from the original transaction at the time it takes place, and at no other time; and that it cannot be mingled with any subsequent dealings. Some of the cases use the language, 'at the date of the payment of the purchase money;' others, 'at the time of the execution of the conveyance.' But all of them mean the same thing, namely: that it is impossible to raise a resulting trust, so as to divest the legal estate of the grantee, or his heirs, by the subsequent application of the funds of a third person to the satisfaction of the unpaid purchase money. *Botsford* v. *Burr,* 2 Johns. Ch. 406; *Rogers* v. *Murray,* 3 Paige, 390; Lead. Cases in Equity, *supra,* 338. The trust arises out of the circumstances that the money of the real purchaser, and not of the grantee in the deed, formed the consideration of the purchase, and became converted into land."

According to the opinion in *Milner* v. *Freeman,* John Francis held one-half of the land conveyed to him and William T. Francis in trust for Melville.

In *Bland* v. *Talley,* 50 Ark. 71, cited by appellant, the court

found that according to the evidence adduced by the plaintiff, who sought to establish a resulting trust, three brothers, William H. Talley, Frank Talley and John L. Talley, agreed to purchase, and William H. purchased in his own name, furnished all the money, and took the title to himself. The court said in reference to this state of facts: "Now, a parol agreement that another shall be interested in the purchase of lands, or a parol declaration by a purchaser that he buys for another, without an advance of money by that other, falls within the statute of frauds, and cannot give birth to a resulting trust." The facts in the case before us are entirely different. Two brothers, William T. and Melville Francis, purchased the land for themselves, and, according to the agreement made at the time, each one paid one-half of the purchase money before the conveyance of the land was executed.

It is contended that if any trust in favor of Melville Francis existed, it was an express trust, and is void under the statute of frauds. But the trust is based upon the purchase of the land by the two brothers for themselves; and the payment by each of them, in pursuance of the agreement at the time of the sale, of one-half of the purchase money before the execution of the deed, of itself, created it. It cannot be that the consent of the trustee to hold the title for the benefit of the *cestui que trust,* or an agreement so to do, in case of a resulting trust, will change its character. By the agreement the trustee assents to an obligation imposed by the law. The trust would exist without the agreement by operation of law. The agreement cannot destroy the effect of the conditions under which the law presumes the estate is held by the trustee. *Robinson* v. *Leflore,* 59 Miss. 148; *Barrows* v. *Bohan,* 41 Conn. 278; *Cotton* v. *Wood,* 25 Ia. 43.

We do not think that the trust in favor of Melville is stale. His father admitted it. The evidence does not show that he ever denied it. On the contrary, when he and his brother William purchased, they took possession of the land in their own right, and controlled and managed it as their own property; paid taxes on it, and improved it; their father never objecting. This management, control, and ownership over it continued for twenty years or more, and until Melville sold and conveyed to Bowlin. Their claim was never allowed to grow stale, but was always asserted and maintained.

Judgment affirmed.