**SPANGLER v. SPANGLER et al.**
No. 1898.

Court of Civil Appeals of Texas. Beaumont.
March 3, 1930.
Rehearing Denied March 29, 1930.

464

C. L. Carter, S. H. German, and Baker, Botts, Parker & Garwood, all of Houston, for appellant.

Ward & Ward and J. E. Walton, all of Houston, for appellees.

WALKER, J.

August 31, 1893, Charles Peterson deeded to Mrs. Sallie F. Spangler an undivided two-thirds interest in the Philip Thompson survey of 640 acres of land situated in Harris county, Tex., about nine miles from the city limits of Houston, at the time of the date of the deed. The deed recited a cash consideration of $4,586.67 and the assumption of an outstanding vendor's lien note against the property conveyed in the sum of $533.33⅓, and that the said land was "to be the separate estate of the said Mrs. Sallie Spangler and paid for out of her separate money." The other one-third interest was owned by the John W. Harris heirs, and on the 2d day of September, 1894, Mrs. Spangler and the Harris heirs partitioned between themselves the entire 640 acres, she deeding them by specific metes and bounds her interest in a certain 213⅓ acres as their one-third interest in the entire survey, and they deeding to her by specific metes and bounds their interest in 426⅔ acres as her two-thirds interest in the entire survey. The Harris heirs conveyed Mrs. Spangler's interest to her "as and for her separate property." This suit was filed in the fall of 1927 by S. H. and Frank Spangler against Mrs. S. F. Spangler to recover a two-thirds undivided interest in the 426⅔ acres held by Mrs. Spangler, on the theory that this land was originally conveyed to her as trustee for them and their deceased brother Harry, the husband of Mrs. S. F. Spangler. By her answer she denied all allegations of the plaintiff's petition and claimed absolute title to the property. She also pleaded laches and the several statutes of limitation.

The consideration for the Peterson land was $746.67 cash, paid by Mrs. S. F. Spangler, at the time the deed was delivered to her, out of her separate funds, and the assumption of the outstanding vendor's lien as above described which, on maturity, was also paid by Mrs. Spangler out of her separate funds, and the transfer by Harry Spangler to Peterson of H. & T. C. Section 18 in Wilbarger county, Tex. This land was conveyed to Peterson upon an agreed value of $6 per acre, which, with the $746.67 cash actually paid, made up the recited cash consideration. Peterson conveyed his land to Mrs. Spangler

upon an agreed valuation of $12 per acre. Both valuations as recited in the deed were grossly excessive. The explanation given for this excessive valuation by S. H. Spangler was that land was conveyed in that way in those days. There was outstanding against section 18 all of the original purchase price due the state, which was $2 per acre, less the first payment of $42.66⅔, being one-thirtieth of the original price. In fact, the equity owned by Harry Spangler in this section at the time he conveyed it to Peterson had little, if any, market value. About three years after this conveyance, the land was forfeited to the state because of the failure of the then owner to keep up the payments and resold later at $1.50 an acre. There was no evidence offered upon the trial showing anything more than a nominal value to this equity. The cash paid by Mrs. Spangler and the note assumed by her practically represented the value of the Peterson land at the time it was conveyed to her. Beginning with 1898, and continuing until the filing of this suit, Mrs. Spangler rendered this land for taxes and paid all taxes due thereon, amounting to about $3,500.

Plaintiffs sought to raise the issue of trust by the following testimony offered principally by S. H. Spangler, but his testimony was corroborated by other witnesses offered by them. Without giving the detailed testimony of these witnesses, we submit the following summary of the facts testified to by them: Prior to 1885, the exact date not being material, S. H. Spangler, Frank Spangler, and Harry Spangler, the three being brothers, formed a partnership for the purpose of farming and ranching in Wilbarger county, and in furtherance of this purpose bought equities in H. & T. C. sections 8, 12, 13, 18, and 19. Sections 13 and 19 were bought directly from the railroad. Sections 8, 12, and 18 were public free school sections. This public school land was sold under the laws then in force regulating such sales. On May 21, 1885, Mrs. Christian Wemple made application to purchase section 18, making affidavit that she desired to purchase the land as a homestead for herself, and that she was not acquiring it in trust for or for the use and benefit of any other person, and that she had not directly or indirectly made any agreement by which the title to be acquired from the state would inure in whole or in part by lease or purchase to any other person. The affidavit further recited that it was understood that any violation of any provision of the law regulating the sale of the land would work a forfeiture of her rights, and further that the object of the sale to her was for the purpose of securing a bona fide settler on the land. The other essentials of the law regulating the sale of the land were embodied in the affidavit.

On June 28, 1889, Mrs. Wemple conveyed her equity in this land to Marshall & Kerr, who assumed the unpaid obligation to the state, and on the 3d of the following December they conveyed this section to S. H. Spangler for a consideration of $640 cash and the assumption by him of the unpaid purchase money due the state, which was the original purchase price of $2, less the one-thirtieth paid by Mrs. Wemple at the time of her purchase. On December 15, 1890, S. H. Spangler conveyed his equity to his brother and partner, Frank Spangler, who likewise assumed the obligation due the state, and by quitclaim deed dated July 20, 1892, Frank conveyed his equity in this section to his brother Harry, who also assumed the obligation due the state. Harry conveyed it to Peterson at the time and on the consideration above expressed. Though Marshall & Kerr conveyed this section to S. H. Spangler, the conveyance, in fact, was for the benefit of all three brothers, and he took the title for himself and as trustee for his brothers. The consideration paid by S. H. Spangler to Marshall & Kerr was partnership funds. The conveyances by S. H. Spangler to Frank and by Frank to Harry were merely for the protection of the partnership interests and not for the purpose of vesting them with the exclusive title thereto. It was understood and agreed by and between the brothers that these conveyances did not affect or extinguish their partnership interest in the land.

School section 8 was awarded to G. W. Carey upon an affidavit in all respects identical with the affidavit of Mrs. Wemple. He conveyed this section to Harry Spangler on May 27, 1887, who took the title on the same conditions under which the title to section 18 was had. Section 12 was awarded to Frank upon the same character of affidavit made by Mrs. Wemple. Frank, notwithstanding the conditions and terms of his affidavit, in fact made the purchase from the state for the benefit of himself and his two brothers under the same agreement with them controlling the title to sections 8 and 18. In thus taking the title to these three sections, they recognized the bar to a joint purchase, and made the several purchases and affidavits as herein detailed on the advice of their attorney. Sections 13 and 19, purchased direct from the railroad company, were held on the same conditions controlling the titles to the public free school sections. It is not necessary to trace the history of any of these sections except section 18, which has already been given. The partnership in 1893 became insolvent because of the protracted drouth extending through 1892 and 1893, and the financial panic of these years. The assets of the partnership were liquidated and the proceeds applied to the debts, all except section 18. The title to this section was placed

in Harry Spangler that he might sell it for the account of the partnership. S. H. Spangler took part in the negotiations between his brother Harry and Peterson, and knew upon what terms Harry was to convey section 18 to Peterson, and it was understood between them that Peterson was to convey the Harris county lands to Harry.

Neither S. H. Spangler nor his brother Frank knew that Harry had violated his trust agreement with them by having Peterson convey the land to his wife, Mrs. S. F. Spangler, until the Sunday following the date of the delivery by Peterson of his deed to Mrs. Spangler. At that time he went to see Harry and his wife about the matter and asked why the deed had been so made. They explained to him that it was made to Mrs. Spangler instead of to Harry because he was under bond with the railroad company, and they thought it best not to hold the title in his name. At that time Mrs. Spangler recognized her trust relation to S. H. and Frank Spangler, and agreed with them to hold the title in trust for them jointly. Harry Spangler died in 1902, and just prior to his death Mrs. Spangler again recognized her trust relation to S. H. and Frank Spangler.

By her testimony Mrs. Spangler denied any knowledge of any trust in section 18. She testified that this section belonged to Harry individually, and that she understood that S. H. and Frank had no interest in it, and that the sale was made to Peterson by the purchase of the Harris county property in order that Harry might save what equity he had in it. She denied the conversations between her and S. H. Spangler, as testified to by him. She testified that she had at all times claimed this property as her own, and never heard of any claim on the part of S. H. and Frank Spangler until about the time this suit was filed. She further testified that the cash payment and the outstanding vendor's lien note were paid from her separate funds. It is undisputed that neither S. H. Spangler nor Frank Spangler, after the death of their brother, ever asserted publicly or otherwise any claim to this land to any person whomsoever. S. H. Spangler for many years lived in close proximity to this land, but never attempted to use it or to assert dominion over it or assessed it for taxes or paid any taxes on it or made any inquiry about Mrs. Spangler as to the taxes or offered to assist her in the payment of the taxes. The nonclaim on the part of Frank Spangler to this land from its purchase by Mrs. Spangler was more pronounced, if possible, than by his brother, S. H. Spangler. Neither of them ever made any inquiry of any kind whatever of Mrs. Spangler about this land subsequent to the death of their brother. The issues raised by the pleading and the evidence were submitted to the jury by the following questions, answered as indicated:

"Special issue No. 1:

"Was or was not on August 23rd, 1893, Section 18, in H & T C survey in Wilbarger County, held by Harry Spangler for the use and benefit of himself and S. H. Spangler and Frank Spangler?"

"It was."

"Special issue No. 2:

"If you answer Special issue No. 1, 'it was', then answer the following special issue: What was the reasonable market value of the equity of Harry S., Frank Spangler and S. H. Spangler in Section 18, on August 23rd, 1893?"

"$248.22–1/3/00."

"Special issue No. 3:

"(a) Were any part of the partnership funds of Harry, S. H. and Frank Spangler paid on the purchase price of the land in Harris County?

"(b) If so how much?"

"No."

"Special issue No. 4:

"(a) Was any part of the separate funds of Sallie F. Spangler paid on the land in Harris County?

"(b) If so how much?"

"Yes. $786.67."

"Special issue No. 5:

"Did or did not Sallie F. Spangler have knowledge on or prior to August 31st, 1893, that the equity in Section 18, Wilbarger County Land was jointly owned by Harry Spangler, S. H. Spangler and Frank Spangler at the time said land was transferred to Peterson?"

"She did."

"Special issue No. 6:

"At or prior to the time the deed was made and delivered from Peterson to Sallie F. Spangler, did or did not she agree to hold the land in Harris County in trust for herself, S. H. Spangler and Frank Spangler?"

"She did."

"Special issue No. 7:

"Did or did not Sallie F. Spangler any time prior to the death of her husband recognize or admit that she was holding the Harris County land in trust for herself, S. H. Spangler and Frank Spangler?"

"She did."

"Special issue No. 8:

"Were the acts and conduct of Sallie F. Spangler before Nov. 15th, 1917, such as would put a person of ordinary prudence situated as were either S. H. Spangler or Frank Spangler upon notice that she was holding the Harris County land as her own

individual property and not in trust for herself and S. H. Spangler and Frank Spangler?"

"No."

On this verdict judgment was entered in favor of plaintiffs against defendant for an undivided interest of 138.31 acres of land with a partition decree and in her favor against plaintiffs for $1,536.76 as their part of the taxes paid by defendant, with foreclosure of lien against the land awarded them for that amount. From this judgment defendant duly perfected her appeal to the Galveston Court of Civil Appeals, and the case is properly before us on transfer made by the Supreme Court.

### Opinion.

We will first consider appellant's assignment that the amount of land awarded appellees by the judgment appealed from is excessive. The extent of appellees' interest in the Harris county land, if any, is the value of their equity in section 18 at the time it was traded in as part of the purchase price of the Harris county land. Appellees cross-assign error against this proposition saying that, since the parties agreed at the time of the trade that this equity was worth $6 per acre, the actual value cannot be inquired into. That contention is overruled. The value of $6 was arbitrarily fixed for trading purposes, and had no relation to the actual value of the land. Appellees are appealing to a court of equity for relief, and can have relief, if at all, only to the extent of the market value of their interest at the time of the trade. The balance of the purchase price on the Harris county land was paid by appellant in cash, and it would be most inequitable to balance her cash payment against an inflated value agreed upon merely for trading purposes and which all parties knew at the time had no actual relation to its cash value. By question No. 2 the court asked the jury the value of appellees' equity in section 18 at the time of this inquiry. This question, by its terms, submitted to the jury the joint value of the partnership interest; that is, the value of the equity owned jointly by the three brothers. The answer was $248.22⅓. This answer fixed the value of the equity owned by the partnership in section 18 at the time it was traded to Peterson as a part of the purchase price of the Harris county land.

Against this construction of question 2 and its answer the trial court construed this question as a submission to the jury of the value of the interest of each of the three brothers, and construed the answer as fixing the value of each brother at $248.22⅓, and, in estimating the amount paid by the partnership on the Harris county land, multiplied this answer by three, thus fixing the value of the partnership interest at $744.-67. The question and answer are not subject to this construction. But, if we are in error in this conclusion, then we agree with appellant that the value fixed by the trial court is so against the great weight and preponderance of all the testimony as to be clearly wrong. The partnership bought section 18 in 1889, paying only $640 for the equity. Subsequent to 1889 was a drouth of two years' duration and the great financial panic of 1892, resulting in the bankruptcy of the partnership. Giving due weight to every circumstance, in the case, we think the partnership equity in Section 18 had but little real or market value at the time of the trade. However, it probably had some value, and, as the finding of the jury on our construction of the question is not wholly without support, we sustain it on the construction we have given it. In answer to question No. 3 the jury found that the equity in section 18 was all the consideration paid by the partnership on the Harris county land.

Answering sections (a) and (b) of question No. 4, the jury, in effect, found that appellant paid the balance of the consideration and fixed the amount at $786.67. Section (a) of this question has support. The amount fixed at $786.67 is wholly without support. There is no testimony to sustain this finding. Beyond controversy, and under all the testimony, and without any dispute whatever, if appellant paid anything on this land, she paid the cash payment of $746.67, and the vendor's lien note assumed as part of the consideration in the sum of $533.33⅓. It follows that we must sustain appellant's attack against the answer to section (b), and in lieu of the finding of the jury we fix the amount actually paid by appellant on the consideration for the Harris county land at $1,281. Appellees, on the consideration, are entitled to a credit of two-thirds of $248.22⅓, making $165.48. Appellant, in addition to the cash paid by her, is entitled to a credit of the other one-third of $248.22⅓. On these figures appellees paid on the Harris county land $165.48 and appellant $1,363.74. Dividing the land on this basis, appellees have an interest of only 46.2 acres and appellant an interest of 380.46 acres. In this connection it should be further said that the taxes paid by appellant should be proportioned between her and appellees on the same basis.

But on the undisputed facts she contends that appellees have no interest in the land, and asked for an instructed verdict on three theories, which we summarize and discuss as follows:

First, she says the evidence failed to raise the issue that section 18 was partnership property. This contention is overruled. Under the statement already made, the issue was clearly raised that the partnership bought section 18 as partnership property, and that the title was put in Harry's name, to be held by him in trust for the partnership. This

conclusion overrules appellant's attack against the answer of the jury to question No. 1. The answer to that question has support.

■■ Appellant's second contention is that the agreement under which Harry held the title to section 18 was against the law of the state and its public policy, and therefore section 18 did not constitute such a part of the consideration for the Harris county land as a court of equity would recognize and enforce. Appellant was not entitled to an instructed verdict on this theory of the case. Accepting as true the testimony offered by appellees, in deference to the jury's answer to question No. 1, the entire scheme under which the partnership purchased and held section 18, together with public free school sections 8 and 12, was against the laws of the state and its public policy under which it was at that time selling its public free school lands. Therefore no trust was created in section 18 as and when the title was conveyed to Harry which a court of equity would or could recognize or enforce. The reason for this conclusion is so clearly stated in Houston Oil Co. v. Votaw (Tex. Civ. App.) 184 S. W. 647, with which this case is on all fours, that a further analysis of the law or citation of additional authorities is not necessary. The agreement had no binding effect whatever against Harry or a holder under him with notice, but was absolutely void as far as it related to judicial relief. Harry held absolute title, free of any and all enforceable claims by his brothers. But, while they had no enforceable rights in section 18, there was no legal bar against a new agreement, recognizing the trust relation, to trade section 18 for the Harris county land, upon a new express trust agreement that the title thereto should be taken in Harry's name and held by him in trust for the partnership. Hartford Fire Ins. Co. v. G., H. & S. A. Ry. Co. (Tex. Com. App.) 239 S. W. 919; Hall v. Edwards (Tex. Com. App.) 222 S. W. 167; Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787; Schwarz v. Lee (Tex. Civ. App.) 287 S. W. 519; Finley v. Stripling (Tex. Civ. App.) 15 S.W.(2d) 711; Sanger v. Futch (Tex. Civ. App.) 208 S. W. 681; Rumbaugh v. Morriss (Tex. Civ. App.) 264 S. W. 198. A title that Harry could have held in trust in his own name he could deliver to a third person upon an oral express agreement that the grantee would hold the same in trust for the partnership. Henderson v. Rushing, 47 Tex. Civ. App. 485, 105 S. W. 840; Allen v. Allen (Tex. Civ. App.) 105 S. W. 53; Houser v. Jordan, 26 Tex. Civ. App. 398, 63 S. W. 1049. That was the issue submitted by question No. 6.

■■ But, by her third contention, appellant says that no issue of express trust arose on the facts; that at the most the testimony raised only the issue of a constructive trust, and under all the testimony this trust was barred by limitation. Under no theory of the case, however favorable the testimony may be construed in favor of appellees, did it raise the issue of a constructive trust. This trust is purely a construction of the law, raised and enforced by a court of equity as a principle of justice. To support this trust a situation must exist authorizing the court to declare a trust in the land claimed in order to prevent the doing of a wrong; that is, the circumstances must authorize the court to "turn the holder of the legal title into a trustee to get at him" in order that the holder may not perpetrate a fraud against the claimant. Faville v. Robinson, 111 Tex. 48, 227 S. W. 938. In this case, in answer to question No. 5, the jury found that appellant on or prior to the date she took the title to the Harris county land, knew of the partnership agreement by which Harry held the legal title to section 18. She testified that she took the title absolutely for herself. Now, accepting as true her testimony, and sustaining the answer of the jury to question 5, she created a condition authorizing the court to construct a trust against her, provided, in taking the title, she perpetrated an actionable wrong against appellees. But that was not the legal effect of her act in taking the title in her name. Harry had the legal right to repudiate the agreement with his brothers under which he was holding section 18. As a court of equity could not interfere to protect appellees' interest in section 18 against such a repudiation by Harry, it follows logically that it could not interfere to construct a trust against appellant, who was a party to the wrong done by Harry to his brothers; that is, a court of equity could not turn her into a trustee in order to protect the unenforceable trust under which Harry held section 18.

Appellant pleaded limitation and laches against the constructive trust which she assumes was raised in favor of appellees. This issue went to the jury under question No. 8, and was found against her. The answer to this question is attacked both on the ground that it is wholly without support and that it is so against the great weight and preponderance of the testimony as to be manifestly wrong. While not necessary to pass upon these propositions, in view of the disposition we are making of the case, yet, that all issues may be disposed of, we sustain the contention that the answer to this question is so against the great weight and preponderance of the testimony as to be manifestly wrong. The preliminary statement sustains this conclusion. We do not say, however, that there was no evidence to support the answer.

■■ It is also necessary, under this third contention, to dispose of the theory of a resulting trust. A resulting trust is not an express trust, but differs from it in that an express trust rests upon an express agreement while a resulting trust rests upon a presumed

intent. This presumption is that the parties have dealt with each other in good faith and with an honest purpose to protect their mutual interests. A resulting trust must arise from the state of facts existing at the time the legal title to the property is acquired, and cannot arise from matters coming into existence afterwards. 39 Cyc. 128. It is essential that the person who claims its benefits must have such title to or interest in the consideration paid for the property claimed by him as a court of equity will recognize and enforce. 39 Cyc. 127. The mere statement of this proposition excludes the theory of a resulting trust because the interest of appellees, if any, in section 18, as we have already determined, was not such as a court of equity could or would protect.

■ From what has been said, it follows that appellees' claim to this land rests alone upon the theory of an express trust, and this trust rests upon the answer to question No. 6, which appellant has attacked as being wholly without support in the testimony. In our discussion of the sufficiency of the evidence to raise this issue, it must be borne in mind that appellant has challenged the answer to question No. 6 alone upon the single ground that no evidence was offered raising the issue. There is no proposition that it is so against the great weight and preponderance of the testimony as to be manifestly wrong. Under our decisions these propositions must be raised by separate assignments. We think the issue was raised. In addition to the facts given in the preliminary statement, S. H. Spangler testified as follows:

"On the Sunday following the closing of the trade with Mr. Peterson I went out to Harry's house at Clay and San Jacinto, they had rooms there with Mrs. Hall upstairs, and talked with Harry and Sally F. Spangler in reference to this trade and about it being taken in her name and it was again stated that it had to be taken in her name in order to keep him clear on account of the bond, there was a $533 obligation to be assumed on it. With reference to what did Sally F. Spangler say with reference to holding it in trust; we discussed what we would do with the land, and we all agreed the only thing that could be done was hold it until it would grow in value and that was definitely understood and agreed among us. I asked the question why he took the section in Sally's name and he stated for the same reason that I put section number twelve in her name, because Mr. Underhill had requested me to keep clear from any other business, that they did not want him to do anything else and he said he put it in her name and carried it for our mutual benefit and she agreed whenever this land is of any value and you want to dispose of it, we can easily do it and will do it."

Since appellant, under the answer to question 5, knew of the agreement under which Harry held the title to section 18, we think this testimony was evidentiary upon the issue of an express trust, and was of sufficient weight to carry the question to the jury. This quoted testimony was directly on the issue that appellant, at the time she took the title, agreed to hold it in trust. Lasker-Morris Bank & Trust Co. v. Gans, 132 Ark. 402, 200 S. W. 1029; Grayson v. Bowlin, 70 Ark. 145, 66 S. W. 658; Brame v. Read, 136 Va. 219, 118 S. E. 117; Nougues v. Newlands, 118 Cal. 102, 50 P. 386.

■ We agree with appellant that it is the law of this state that a parol trust can be ingrafted upon a deed absolute on its face only where the trust is shown with clearness and certainty. Carl v. Settegast (Tex. Civ. App.) 211 S. W. 506, and authorities therein cited. But it is also the law that the jury cannot be so charged. Same case by Commission of Appeals, 237 S. W. 238. So any testimony of probative force, as in any other case, would raise the issue, and it would be error to instruct against it. This principle of law, then, is available to one denying the trust only upon motion to set aside the verdict against him on the ground that it is against the great weight and preponderance of the testimony when weighed by the correct rule of law. If the trial court overrules this assignment, it must be renewed in this court, which appellant has not done. However, we would say that, if we are in error in this construction of appellant's proposition, and if, in fact, it is broad enough to raise the issue that the answer to question No. 6 is so against the great weight and preponderance of the testimony as to be manifestly wrong, then, under the facts given in the preliminary statement, the answer should be set aside.

■ But, on our construction of appellant's proposition, the issue just discussed is not before us, and the objection to the answer to this question must be overruled. Under this answer the lower court correctly ingrafted an express trust upon appellant's absolute deed in favor of appellees to the extent of their interest in the land. Though appellant pleaded the defenses of laches and limitation, she showed no adverse possession, and therefore, as against the express trust, these defenses were not available. Montgomery v. Trueheart (Tex. Civ. App.) 146 S. W. 284; Wilson v. Simpson, 80 Tex. 287, 16 S. W. 40.

It follows from what has been said that the judgment of the lower court must be reversed and here reformed, reducing the interest of appellees in the land sued for to 46.2 acres, and that the amount of taxes charged against appellees be reduced in like proportion. In so far as the judgment of the lower court decreed partition, it is affirmed as to the interest hereby awarded appellees.

Reformed and affirmed, with the costs of appeal taxed against appellees.