## ARKANSAS LOUISIANA GAS CO. v. MAX et al.

### No. 3252.

Court of Civil Appeals of Texas. Beaumont.

June 8, 1938.

Rehearing Denied June 22, 1938.

Phillips, Trammell, Estes, Edwards & Orn, of Fort Worth, for appellant.

Rowell & Rowell, of Jefferson, and W. B. Chauncey, of Wichita Falls, for appellees.

O'QUINN, Justice.

On the 11th day of December, 1934, Mrs. Ruby Owens owned as her separate property a tract of sixty (60) acres of land out of the J. J. Williams Survey in Marion County. On that date she and her husband signed a written instrument which purported to lease the oil, gas, and other minerals in and under the land to K. O. Bundy. This instrument not only bore the signatures of Mr. and Mrs. Owens, but also their statutory acknowledgment, dated of even date with the lease, and under the signature and seal of W. S. Ford, a Notary Public. Bundy was the agent of appellant, Arkansas Louisiana Gas Company, in taking this lease, and on the 21st day of February, 1935, he assigned it to his principal. On the 9th day of January, 1935, Mr. and Mrs. Owens executed, acknowledged, and delivered a second lease on the sixty (60) acres of land to Johnnie Max.

This suit was a controversy between appellant, claiming under the Bundy lease, and appellee, Johnnie Max, et al., claiming under the Max's lease, over the minerals lying in and under the sixty (60) acres of land. Without summarizing the pleadings, it is sufficient to say that the only issue made by the pleadings was whether or not

**384**

Mrs. Owens appeared before the Notary Public as recited in his certificate of acknowledgment. That issue was submitted to the jury by the following question:

"Do you find from a preponderance of the evidence that Mrs. Ruby Owen did not appear before W. S. Ford at her home at Lodi on the 11st day of December, 1934?"

By its verdict, the jury found that Mrs. Owens did not appear before the notary, and on the verdict, judgment was entered in favor of appellees on their cross action praying for affirmative relief, cancelling the Bundy lease and vesting appellees with title to the minerals in and under the sixty (60) acres of land.

We sustain appellant's proposition that the verdict of the jury was against the overwhelming weight and preponderance of the testimony. On the issue submitted to the jury, Jimmie Owens, a son of Mrs. Ruby Owens, seven years old on the date of the Bundy lease, nine years old at the time of the trial, testified as follows:

"He knew Bundy and had known Mr. Ford all his life. He saw K. O. Bundy in his home on December 11, 1934, when Bundy came to his house. There was no one with him. While Mr. Bundy was there, he saw his mother sign a lease. Mr. Ford was not present at the time. Mr. Bundy went over to Mr. Hick's house after the mother signed the paper. Before that time, he had seen Mr. Ford over at Mrs. Hick's house. After Mr. Bundy left the house, his mother was still in the house. From the time Mr. Bundy left there that afternoon, until night, his mother stayed in the house 'most of the time.' He stayed in the house with his mother. When he was not in the house, he was getting in wood. He doesn't know how long it took him to get the wood. When he left to get the wood, his mother was in the house, and when he came back with the wood she was still there in the house.

"'Q. So far as you know, did Mr. W. S. Ford come down to the house that day, any time of the day? A. No, sir.

"'Q. Was he in the house on that date at all? A. No, sir.

"'Q. So far as you know? A. No.

"'Q. Was he at the house from the time Mr. K. O. Bundy came there, until night? A. Who?

"'Q. Mr. Ford? A. No, sir.

"'Q. About how long have you known Mr. Ford? A. All my life.

"'Q. On that day did you see him around your house? A. No, sir.

"'Q. Tell the jury whether or not you heard him talking to your mother around the house on that date, or any other place on that date. A. No, sir.'

"On cross-examination, Jimmie Owen testified:

"Q. Do you remember playing baseball on that day? A. No. I played it all the time—in the winter too.

"Q. I believe you said that Mr. Bundy came there on December 11, 1934? A. Yes.

"Q. How do you know it was December 11, 1934? A. Oh.

"Q. How? A. (No answer).

"Q. Tell the jury how you know it was December 11, 1934. A. I don't know.

"Q. You don't remember the date, do you? A. No.

"Q. Who have you talked to about your testimony in this law suit? A. Judge Chauncey.

"Q. There's nothing that makes you remember what you did any more on December 11, 1934, than there might be on December 8th, is there? A. (No answer).

"Q. You could not tell us what you did each day in 1934. How old were you then? A. Seven.

"Q. Seven. You could not tell this jury what you did each day in December, 1934, when you were seven years old, could you? A. No.

"Q. You just couldn't do that? A. No.

"Q. And you don't remember staying in the room all that day, do you? A. I did not stay in the room.

"Q. You did not stay in the room all afternoon that day? Do you remember particularly going out and getting wood, or do you just remember generally that that is one of the chores around the house. A. Yes.

"Q. You did not sit at the window all that day, did you? A. No.

"Q. Just answer the question: How do you know Mr. Ford did not come to the front gate that day? A. I don't know that he didn't.

"Q. You did not sit at the window, did you? A. No, sir.

"Q. And you did not stand at the door, or any place where you can see the front gate, all afternoon, did you? A. No, sir.

"On re-direct examination, Mr. Chauncey asked Jimmie Owen the question, 'Did you see Mr. W. S. Ford pass along there?' A. No.

"On re-cross examination, Jimmie Owen testified:

" 'Q. Were you at a place where you were looking at the front gate all afternoon? A. No.'

"Mrs. Ruby Owens testified:

"That she met K. O. Bundy 'just a few months before, in getting leases.' The first time she saw him, Mr. Ford came to the house with him. She did not sign any lease on that occasion. On a second occasion Mr. Bundy came to her house to see her with Mr. Ford. At the time when she executed the lease, which is the next time she said he came there, no one was with Mr. Bundy. Bundy was at her house on December 11, 1934, about forty minutes, and her son Jimmie was there at that time. Bundy did not have the lease with him when he first came in, and went back to his car and came back to the house and had the lease with him. She looked the lease over and asked Bundy if R. C. Owen had signed it. She further testified as follows:

" 'Q. Did you read the lease? A. I don't think I did.

" 'Q. Did he explain all the different terms of the lease to you? A. Not all of it.

" 'Q. What part did he explain to you? A. Where it would be paid and how it would be paid off, and where it covered the oil, about the drilling, and like that.' She said she did not read all of the printed matter; nor did Mr. Bundy read it to her; but 'he talked about it but he did not read it to me.'

" 'Q. Did he explain the different terms of this lease, the printed matter, etc.? A. I don't think so.' She did not know what part he explained to her, but he did explain the rentals; and she admitted she signed his lease. Bundy took the lease away with him, to his car over at Mr. Hick's.

" 'Q. Did you later see Mr. Bundy? A. I saw him pass the house going to Lodi.'

" 'Q. About how long was that after you had signed the lease? A. A few minutes.

" 'Q. Who was with him? A. Mr. W. S. Ford.

" 'Q. Were they in the car together? A. Yes.

" 'Q. Did they stop at your house? A. No, sir.'

"She denies having had any conversation on December 11, 1934, with W. S. Ford, or that he asked her any questions about the Bundy lease; and she told Bundy, 'I could not see his Notary.' She has no recollection of his reply, but she told Bundy there was a notary at Mr. Callison's store that he could bring up there. After Mr. Ford and Mr. Bundy passed her house, she did not see them any more that day. Her conversation about the lease was with Mr. Bundy in her living room, and she did not leave the room until after she saw Ford and Bundy pass down the road. It was only a few minutes before they passed. Over objection, she was permitted to testify that she never at any time went before Mr. Ford and acknowledged the execution of this instrument. And over the same objection, testified,

" 'Q. Has he ever appeared before you as a notary to take your acknowledgment? A. No, sir.'

"On cross-examination, Ruby Owen testified as follows:

" 'Q. When he stopped by to see you on December 11, had you made up your mind to let him have the lease? A. Yes.

" 'Q. Prior to the time that you signed the lease, Mr. Bundy had talked the lease over with your husband, Mr. Owen, hadn't he? A. Yes.

" 'Q. Mr. Owen had read the lease over prior to the time you signed it, hadn't he? A. I think he had.

" 'Q. And had discussed the terms of the lease with you prior to the time you signed it? A. Naturally we had talked about it.

" 'Q. When Mr. Bundy was there, he handed the lease to you for you to look at, didn't he, Mrs. Owen? A. Yes. She admitted endorsing the draft (Plaintiff's Exhibit No. 5).

" 'Q. Isn't it a fact that on December 11, 1934, that Mr. W. S. Ford came down to your house, about from the Hicks' house, came down as far as the gate to your house? A. He passed my house in a car.

" 'Q. Didn't he walk down on foot from the Hicks house to the front gate of your house? A. He didn't.

" 'Q. Were you there where you could see? A. I was there in the room.

" 'Q. And where you could see the front gate? A. Yes, there was a big double window.

" 'Q. And is it your testimony that Mr. Ford did not come down there from the

Hicks house to the front gate of your house? A. I did not see him.'

"On re-direct examination, Ruby Owen testified that when Mr. Bundy and Mr. Ford passed down the road in the car she was in the same room where she signed the lease to Bundy and had not left the room."

Appellee, Johnnie Max, testified:

" 'Before Mr. and Mrs. Owen signed said lease to you on January 9, 1935, you knew they had already signed a lease prior thereto, on December 11, 1934, to K. O. Bundy, didn't you? Answer. Yes, sir.' On a former trial of this suit, Johnnie Max also testified:

" 'Q. You knew when you went up there that Mr. and Mrs. Owen had signed a lease to K. O. Bundy? A. They told me they had given him a lease but they had not received the money and they thought the lease wasn't any good.

" 'Q. They told you that when you went up there to take the lease of yours? A. Yes, sir.

" 'Q. They told you before you took the lease, didn't they? A. Yes, sir.

" 'Q. Did they say anything to you about the acknowledgment at that time? A. No, sir.

" 'Q. Neither one of them did? A. No, sir, neither' * * * ."

Mr. W. S. Ford, the notary, testified:

"That he was 'in the presence of Mrs. Owen' several times when Mr. Bundy was discussing with her the execution of an oil and gas lease on land. At those times, the oil and gas lease was read to Mrs. Owen. 'She read it some herself, Mr. Bundy read it, and I read it.' He identified his signature to the joint acknowledgment of the oil and gas lease to Bundy dated December 11, 1934."

"On the afternoon of December 11, 1934, about one-thirty or two o'clock, he and his wife and K. O. Bundy went to the residence of E. E. Hicks at Lodi. Bundy that day got a lease from E. E. Hicks and wife. Mrs. Hicks was W. S. Ford's sister. W. S. Ford and K. O. Bundy left Mrs. Ford at the Hicks home and got in Bundy's car and went to see Mr. Hicks in the country, and Major Harper, E. E. Hicks and his son Charlie Hicks and a Bobbitt boy got in Bundy's car and started to Lodi, and on the road caught up with Mr. Hicks' team. Mr. Hicks got out of the car and took over his team and came to Lodi behind Bundy, but Charlie Hicks rode back to his father's E. E. Hicks' house with Ford and Bundy. When they got to Lodi, they drove right by Mrs. Owen's house—150 yards from the Hicks house—and Bundy got out in front of Mrs. Owen's house and Ford drove the car to the Hicks house. The Hicks boy was still in the car with Ford when they got to the Hicks house, and Ford got out and went inside of the Hicks house and Bundy was in the Owen's house. Helen Hicks, Bessie Hicks and Mrs. Ford were there. Ford stayed in the Hicks house while Bundy was in the Owen's house. After about twenty-five minutes, Bundy came out of Mrs. Owen's house to his car and got some papers out of it and went back to the Owen's house, and ten or fifteen minutes later Mr. Ford saw Bundy coming out of Mrs. Owen's house and went to Mr. Bundy's car and got his hat, and Ford went out and met him at the car.

" 'Q. And you went from the Hicks home out to the car? A. Yes.

" 'Q. Where was the car parked? A. Right in front of the Hicks house.

" 'Q. Were you instructed by Mr. Bundy to go any place? A. Yes.

" 'Q. Where were you told to go? A. To go down to Mrs. Owen's.

" 'Q. And what were you told to go down there and do? A. Take her acknowledgment of the lease that she had just signed.

" 'Q. Did you go to Mrs. Owen's house? A. Yes.

" 'Q. What for? A. To take her acknowledgment.

" 'Q. Did you see Mrs. Owen on that occasion? A. Yes.

" 'Q. How far did you go? A. I went to her yard gate.

" 'Q. Where was Mrs. Owen? A. She was on the gallery.

" 'Q. Do you remember whether she was on the gallery when you got to the gate, or whether you called her out? A. I am not positive.

" 'Q. About how far is it from her yard gate to her gallery? A. About twenty-five feet.

" 'Q. Did you take anything with you when you left Mr. Bundy and went down to Mrs. Owen's house? A. I took that oil and gas lease.'

" 'Q. Did you see Mrs. Owen when you got down to her front gate? A. Well, I saw her immediately afterwards. If she

wasn't on the front gallery, I called her and she came on the front gallery.

" 'Q. Did you say anything to her? A. I asked her if she signed that lease.

" 'Q. Is that the lease I have just shown you—Exhibit No. 4? A. Yes.

" 'Q. Did you hold it up to her? A. Yes, I held it up.

" 'Q. What did she say? A. She said she did.

" 'Q. What did you do then? A. Well, if I remember correctly, I turned around and walked away, back to the car or back· to the Hicks house.' "

■ Every circumstance of Mr. Ford's testimony was corroborated beyond con-·troversy except that he went to Mrs. Owen's home, and, while she was on the gallery, exhibited to her the Bundy lease and asked her if she signed it. It was shown beyond controversy by other testimony that, as testified to by him, Mr. Ford left Mr. Hick's home for the purpose of going to the Owen's home. On this statement, the verdict of the jury was against the overwhelming weight and preponderance of the testimony. In order to impeach a certificate of acknowledgment in due form by allegations that the grantor did not appear before the notary as recited in his certificate, the evidence must be "clear, cogent, and convincing, beyond reasonable controversy;" Blankenship v. Lusk, Tex.Civ.App., 77 S.W.2d 341, 342; the authorities cited by Judge Alexander in that opinion support his proposition.

Appellees' evidence raised the issue that Mrs. Owen did not appear before Mr. Ford, and for that reason appellant was not entitled to an instructed verdict, Spangler v. Spangler, Tex.Civ.App., 26 S.W.2d 463, but the evidence is not clear, cogent, and convincing, beyond reasonable controversy. Jimmie Owen's testimony can be given but little weight. By his cross-examination it was demonstrated that Jimmie had only the faintest recollection of what happened in his mother's home, and was not positive on any point in his testimony. In fact, as we understand his testimony, on cross-examination he admitted that he did not know whether or not Mr. Ford came to his mother's home on the date in question. Mrs. Owen testified, with reasonable certainty, that she was not in Mr. Ford's presence, and that he did not come to her for the purpose of taking her acknowledgment, at the time testified to by him. But Mrs.

Owen did sign the lease; she had talked many times about signing the lease; she had it under consideration for some time; her act in signing the lease was deliberate, with knowledge of all the facts necessary to give her a clear understanding of what she was doing. She admitted that Mr. Bundy wrote the lease in her presence, and when he finished preparing it, she signed it. Mr. Bundy knew that the lease had to be executed with her acknowledgment. She having signed the lease, he had no reason to doubt that she did acknowledge it. It would be a most unreasonable construction of the circumstances attending the execution of this lease to say that Mr. Bundy took his notary and left Lodi without giving Mrs. Owen an opportunity to acknowledge it.

■ It is also the law that the testimony of the person, impeaching his acknowledgment, is insufficient to overcome the certificate of the officer; to·meet the burden imposed by law, his testimony must be corroborated, not by evidence of slight probative force, but by evidence of·cogency and weight. Under this rule the testimony of Jimmie Owen, as we construe it, is not of sufficient weight and cogency to constitute a corroboration of the testimony of Mrs. Owen.

■ For these reasons the verdict of the jury must be set aside as being contrary to the great weight and preponderance of the evidence.

The ambiguity, if any, in the question submitted to the jury, can be removed by instructing the jury to answer the question "She did not appear before the notary" or "She did appear before the notary," omitting the instruction "as you may find the facts to be."

■ In order to establish the fact that Mr. Ford was negligent, as a Notary Public, in taking acknowledgments, appellees introduced testimony that he took quite a number of acknowledgments before he qualified as a Notary Public in November, 1934. It was affirmatively stated by appellees that this testimony was not offered to impeach the integrity of Mr. Ford, but only to show that he was negligent in taking acknowledgments. On this issue, the testimony was not admissible. Missouri, K. & T. R. Co. v. Johnson, 92 Tex. 380, 48 S.W. 568.

■ The court did not err in refusing to submit certain special issues requested by appellant, which only submitted in different

form the very issue that was in fact submitted.

The other errors assigned need not be repeated upon another trial.

The judgment of the lower court is reversed and the cause remanded for a new trial.

Reversed and remanded.